IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALISA MICHELE MORGAN,

                                                         OPINION AND ORDER

                    Plaintiff,
                                                         11-cv-730-bbc

          v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        Plaintiff Alisa Michele Morgan is proceeding pro se, seeking judicial review of

defendant Michael J. Astrue's denial of her application for Disability Insurance Benefits

under Title II of the Social Security Act, 42 U.S.C. § 402(g).  Plaintiff contends that the

administrative law judge erred in determining that she is physically capable of performing

substantial gainful work despite her seizure disorder, neck and back pain and migraine

headaches and that she is emotionally capable of working despite her depression.  I conclude

that the administrative law judge considered all of the evidence and reached the right result.

Therefore, I will affirm the denial of benefits.

        One matter needs to be discussed at the outset.  Plaintiff included with her reply brief

two medical reports that are not part of the record. The first is a report of service rendered by Dr. Dimitrios Fanopoulos, from the Department of Rheumatology at the Beloit Health System Clinics, on March 23, 2012. I have not considered this report because it was concerns matters that were not before the administrative law judge when he made his decision. The second appears to be a clinical record prepared by Karen Mascharka, LPC, prepared the day after she had seen plaintiff at Beloit Memorial Hospital. This report is summarized in the facts section below.

The following facts are drawn from the administrative record (AR).

RECORD FACTS

A. Background

Plaintiff was born on September 8, 1965. She is 5'8" tall and weighed about 237 pounds at the time of her May 2011 hearing before the administrative law judge. Her past work includes jobs as a housekeeper for Meriter Hospital and for University Hospital, both in Madison, Wisconsin; as a machine operator, packer and quality inspector at Madison-Kipp Corporation; as a laundry worker folding clothes; and as a janitor at the Madison Opportunity Center. AR 46-52. Her most recent job was at Meriter, where she worked until January 29, 2010, when she was terminated for excessive absenteeism. AR 48. After her termination, she applied for unemployment compensation benefits, which she was

continuing to receive as of the date of her hearing.  AR 47-48.

Plaintiff applied for social security disability benefits on February 2, 2010, alleging disability beginning January 29, 2010.  Her claim was denied initially and again on reconsideration.  Her written request for a hearing was granted.  The hearing was held on May 25, 2011 before Administrative Law Judge Arthur Schneider.  Plaintiff was represented at the hearing by her counsel, Kerry Hellmuth.  James Armentrout, Ph.D., testified as an impartial medical expert and Karl Botterbusch, Ph.D., testified as an impartial vocational expert.

In a decision issued on June 11, 2011, the administrative law judge found plaintiff not disabled.  AR 9-20.  On October 13, 2011, the Appeals Council notified plaintiff that it had denied her petition to review the administrative law judge's decision, AR 1, leaving his decision the final decision of defendant Commissioner of Social Security.

B. <u>Medical Evidence</u>

To make it easier to follow plaintiff's extensive medical history, I have set it out chronologically, omitting plaintiff's visits to doctors or hospitals for colds and other minor illnesses or gynecological care.

| 10/30/08 | AR 323. | Plaintiff had MRI of brain, which was negative. |
| 11/19/08 | AR 324 | Plaintiff had CT scan of head; results were "unremarkable." |

3

| | | |
|---|---|---|
| 2/4/09 | AR 888-89 | Plaintiff seen by Dr. Henry Juan at the Beloit Health System to ask him to complete a Family Medical Leave Act paperwork because of her migraine headaches; he refused because plaintiff was already seeing other doctors and he was "not comfortable" with her request. |
| 5/29/09 | AR 873 | Plaintiff seen by Dr. Sidney Schulman for a flare up of intense pain following a subacromial bursa steroid injection administered two weeks earlier.  Schulman found increased tenderness in plaintiff's left shoulder. |
| 9/18/09 | AR 398-400 | Plaintiff seen by Dr. Seema Kumar, Mercy West Clinic, for seizures and headaches; Kumar increased the amount of Keppra plaintiff was taking for seizures.  Plaintiff did not mention neck pain.  She told the doctor she had stopped drinking alcohol in October 2008. |
| 10/4/09 | AR 390-92 | Plaintiff seen at Meriter Hospital emergency room for migraines and told to follow up with her own doctor. |
| 10/12/09 | AR 393-94 | Plaintiff seen at Beloit Memorial Hospital emergency room for migraines; prescribed Toradol and Zofran. |
| 10/21/09 | AR 373 | Plaintiff seen by Dr. Kumar at Mercy West Clinic for a followup on her seizures and headaches; plaintiff complained of neck pain.  Kumar ordered an MRI of plaintiff's cervical spine. |
| 10/28/09 | AR 341-42 | Plaintiff seen by Dr. Ahmed Farrag at the Beloit Upper Clinic, complaining of non-specific pain in neck.  No prescriptions provided. |
| 10/28/09 | AR 389 | Plaintiff seen by Dr. Hernandez at Mercy Health System and provided an FMLA letter for two days' leave. |
| 10/29/09 | AR 321 | MRI of plaintiff's cervical area showed large posterior disk osteophyte complexes at C3-4 and C4-5 levels having mass effect upon adjacent spinal cord, with moderate to severe central |

4

|          |                    | canal narrowing.  Questionable minimal cord signal change at these levels. Overall underlying congenital narrowing of cervical spinal cord. |
|----------|--------------------|--------------------------------------------------------------------------------------------------------------------------------------------|
| 11/11/09 | AR 371             | Plaintiff seen by Dr. Kumar to obtain results of MRI.  Kumar reported that plaintiff was still having neck pain and stiffness, with the neck pain radiating to bilateral upper extremities and an episode of right leg and left hand numbness that lasted for 10-15 minutes.  She noted that plaintiff was to see Dr. Rust to investigate the availability of surgical options. Plaintiff reported having been seizure free since her last visit and Kumar planned to continue her on Keppra, twice a day, to keep them controlled. |
| 12/08/09 | AR 368-69          | Plaintiff seen by Dr. Love at Mercy Pain Center, complaining of neck, arm and right shoulder pain.  Love performed cervical epidural steroid injection at C4-C5 interspace. |
| 12/23/09 | AR 327 & 347-52    | Plaintiff seen at Beloit Memorial Hospital emergency room for migraines; no prescriptions given; told to follow up with pain clinic to stay compliant with pain contract. |
| 12/23/09 | AR 339-42          | Plaintiff seen by Dr. Farrag, Beloit Upper Clinic, complaining of headaches and stabbing pains in neck and back; told to come into pain clinic for test before pain medications would be dispensed.  On examination, Farrag found mild neck pain.  He told plaintiff he would not prescribe any narcotic pain medications for her and that she would have to try other ways to deal with her pain until she could meet with her pain management team on 12/28/09. Plaintiff became angry, stormed out of the office and kicked the door to the waiting area, all the time using foul language. She called the pain clinic to confirm her appointment, calling them "a bunch of fucking assholes" and adding, "I will come back and kill all you sons of bitches." Clinic director Melissa Whitman called the police and filed a report. |

| | | |
|---|---|---|
| 12/23/09 | AR 362 | Dr. Gregory Love wrote plaintiff to say that the clinic would not enter into or continue any controlled substance agreement or any other patient agreement in view of her threat to clinic staff on that day. |
| 1/7/10 | AR 331 | Dr. Hernandez wrote plaintiff to say that he would not be treating her in the future because of her destructive behavior at the clinic and her non-compliance with the pain clinic contract. |
| 1/11/10 | AR 334 | Plaintiff seen by Dr. Lawrence Shea at Mercy Health Urgent Care Beloit, complaining of having had back and neck pain for week and history of herniated discs in cervical spine; diagnosis: herniated disk; seizures, temporal lobe; gastritic medicamentosa (drug-induced gastritis); no narcotic pain medication prescribed. She said she used alcohol occasionally. |
| 1/15/10 | AR 330 | Plaintiff seen by Mitchell L. Lewis, MD at UW Health for chronic back pain; Lewis prescribed Oxycodone and Diazepam and told plaintiff for follow up with her regular physician. |
| 1/22/10 | AR 408-09 | Plaintiff seen by Dr. Monica Vohmann, Meriter Health Services, as new patient, saying that she was not happy with care given by Mercy Hospital and Clinics.  She complained of headaches and seizures and said that Citalopram was not helping her depression.  (Plaintiff had been seeing Dr. Vohmann before she switched to Mercy.)   Vohmann discontinued plaintiff's Diazepam prescription but continued her prescription for Oxycodone. |
| 1/28/09 | AR 362-66 & 407 | Plaintiff returned to Dr. Vohmann, Meriter Health Services, with complaints of chronic pain.  Vohmann completed FMLA certification for plaintiff, reporting that she had been seeing plaintiff since 11/11/03 for migraines, neck and back pain and seizure disorder.  She planned to continue plaintiff on low doses of Oxycodone and Diazepam. |

6

| | | |
|---|---|---|
| 2/24/10 | AR 414 | Plaintiff seen by Dr. Shamshad Anjurn at the Beloit Health Systems Clinic, saying that she was out of Gabapentin for her headaches. He gave her the medication and told her to establish care with a new doctor to continue her medication refills. |
| 3/18/10 | AR 429 | Plaintiff seen by Dr. Christal Tecarro on March 18, 2010 at the Beloit Clinic for a followup of her medical problems. She reported that her neck pain was still quite severe despite her use of Percocet (oxycodone) for pain control and Gabapentin for nerve pain.  She also described her history of seizures and headaches.  She reported being on Diazepam, as well as other medications, and said that she was a non-drinker and non-smoker. |
| 3/28/10 | AR 458-61 | Plaintiff seen at Beloit Memorial Hospital, complaining of headaches and back and leg pain.  She denied smoking or using alcohol.   She was given medications, including Dilaudid, Toradol, Compazine and Benedryl, all intravenously, and discharged when pain decreased and she had no adverse reactions. |
| 4/06/10 | AR 462-65 | Plaintiff seen at Beloit Memorial Hospital, complaining of chronic neck pain and given Toradol and Valium. |
| 4/12/10 | AR 452 | Plaintiff seen by Douglas Keehn, D.O., at Advanced Pain Management, apparently at Dr. Tecarro's referral.   She complained of low back pain.  She reported that she was taking Oxycodone and Diazepam, among other medications, but that they were not relieving her pain.  Dr. Keehn recommended that she continue her medications and participate in physical therapy twice a week for five weeks.  He gauged her Oswestry score as 41 out of 60, indicating severe functional impairment. |
| 4/20/10 | AR 428 | Plaintiff seen at the Beloit Clinic by Dr. Tecarro, who noted "a little bit of paravertebral muscle spasm" in plaintiff's lumbar area and in the paravertebral muscles in the neck.  Dr. Tecarro recommended that plaintiff continue using Ibuprofen and |

7

Keppra (for seizures).  She noted that plaintiff was using Percocet for break-through pain four times a day, as needed.

4/23/10     AR 436     Plaintiff started physical therapy at Beloit Health Systems.

5/17/10     AR 433-34     Plaintiff seen by an orthopedist at the Beloit Clinic, complaining of left hand pain.  An x-ray showed no bony or structural abnormality and no sign of arthritis.  The doctor recommended EMG nerve conduction studies.

5/24/10     AR 450-51     Plaintiff seen at Advanced Pain Management for a followup visit, complaining of low back pain.  She said the pain was aggravated by daily activities and that it interfered with her sleep as well.  She saw no improvement in her activities of daily living and said that the physical therapy had made her back worse.

    Dr. Keehn recommended that plaintiff continue taking her medications, including Percocet.

6/3/10     AR 466     Plaintiff had an MRI of her lumbar spine at the Beloit Memorial Hospital.  The doctor's impression was "[d]egenerative changes of the lumbar spine with disc bulges and degenerative facet disease resulting in mild canal stenosis and neural foraminal stenosis."

6/10/10     AR 448-51     Plaintiff seen at Advanced Pain Management for a followup visit, complaining of low back pain.  Her Oswestry score was 29 out of 50, indicating moderate functional impairment.  She reported taking Percocet and said again that physical therapy had made her symptoms worse.

6/26/10     AR 472-585     Plaintiff admitted to Meriter Hospital in Madison as an emergency admission after she experienced a grand mal seizure at a local hotel where she had spent the night.  She had not taken her seizure medicine in the morning and had had two alcoholic drinks the night before.  She was given her morning

8

medications in the emergency room from her own supply before she was admitted.  While having an x-ray, she had a second seizure lasting about two minutes.  On discharge, it was noted that she was taking Diazepam and Percocet as needed.  She was discharged on 6/28/10 with a followup appointment scheduled with Dr. Krzyszlof Goetzen on 7/31/10 in Beloit.

6/30/10    AR 595-96    Plaintiff seen by Dr. Tecarro for a followup appointment after her seizure.  Dr. Tecarro noted that plaintiff's neck was supple, but "kind of stiff" upon lateral rotation.  Tecarro advised Advil for the neck pain and possible physical therapy if the stiffness did not ease.

7/13/10    AR 592-94    Plaintiff had followup visit with Dr. Goetzen, a neurologist at the Beloit Clinic.  She told Goetzen that she had changed to the Beloit Clinic because she no longer had access to doctors in Janesville as a result of changes in her insurance plan.  Goetzen planned to increase her dose of Levetiracetam (Keppra) for her seizures and start her on Lamictal, but told plaintiff not to start these until she had his permission to do so.

7/19/10    AR 607-13    Plaintiff saw Cornelia Green, Ph.D. for a psychological evaluation.  Green found plaintiff "very sensitive and 'uptight.'"  During the evaluation, plaintiff said she had a migraine coming on and took a pill for it.  In Green's opinion, the headache interfered with plaintiff's short-term memory.  Plaintiff had no ability to do abstract reasoning.  She did not understand proverbs.  She told Green that she was depressed, scared of having seizures, that she had low energy, was always tired and tended to become irritable when she was in pain.  She said she had a church family, is close to her pastor and also to her next door neighbor.  She told Green she had many headaches.  She was oriented to time, place and person, she had normal speech, was able to name the current president and four prior presidents, identify five large cities and knew about the oil spill.

Green diagnosed depressive disorder and impulse control

9

disorder, not otherwise specified. She assessed a global assessment of functioning score of 50. She thought that plaintiff would need to learn more effective ways of dealing with her pain if she was going to go back into the work force. She recommended a supervised inpatient placement, in which her pain medication and therapy could be closely monitored. She thought that plaintiff needed to learn more positive ways of dealing with her day-to-day activities.

7/21/10        AR 710-12        Plaintiff had an initial counseling assessment at Beloit Memorial Hospital with Karen Mascharka. She told Marscharka that she had had a counseling session with an SSI psychologist the day before and had become angry with her because she had laughed at plaintiff in a manner plaintiff thought unprofessional. Plaintiff said she was irritable, nervous, fatigued, depressed, feeling worthless, having problems falling asleep and lacking concentration.

                               Mascharka assessed plaintiff as having a major depressive disorder. She recommended individual psychotherapy.

7/27/10        AR 617-18        Plaintiff saw Dr. Goetzen again. He ordered a followup brain MRI, a referral to an orthopedic doctor for her right rotator cuff pain, a referral to a psychiatrist for her depression and anxiety, and possible treatment with Lamictal, which she had tolerated well in the past.

7/29/10        AR 619-21        Plaintiff saw Dr. Ajmal Matloob at the Beloit Clinic for an evaluation of her right shoulder pain. An x-ray showed no fracture, dislocation or other abnormality in plaintiff's shoulder. Matloob ordered an MRI of plaintiff's shoulder.

8/16/10        AR 622          At a followup visit, Dr. Matloob reported that an MRI scan had revealed evidence of a rotator cuff tear with evidence of impingement. He noted that plaintiff was on Oxycodone and had tried physical therapy and that neither the medication nor the therapy had helped her. Plaintiff asked about surgery; he

explained what it was, as well as the risks and potential complications.

8/17/10    AR 623-24    Dr. Goetzen met with plaintiff and found her depressed and anxious.  She said she would like to talk to a psychiatrist; he planned to recommend one to her.  She was still having back pain and wanted to have surgery for her right rotator cuff pain.  He recommended that she try a steroid injection before the surgery.  He planned to start plaintiff on Topomax for her headaches and continue her Maxalt.

8/23/10    AR 625-26    Plaintiff seen by Dr. Tecarro for a preoperative evaluation before her surgery, which was scheduled for 9/13.  Tecarro found no reason for plaintiff not to undergo the surgery.

9/9/10     AR 628-29    Plaintiff seen by Dr. Goetzen for a followup of her seizures.  She complained about being anxious and depressed and wanting to see a psychologist at the counseling center.

9/21/10    AR 630       Plaintiff seen by Dr. Matloob one week after he had performed right rotator cuff surgery.  He found her incision healing satisfactorily and started her on physical therapy, 3 times a week for 6 weeks.

9/23/10    AR 633-34    Plaintiff seen by Dr. Goetzen for a followup evaluation of her seizures.  Because plaintiff had been rejected as a patient at the Beloit Memorial Hospital in light of her past behavior, Goetzen said that he would refer her to the community health center for evaluation by a psychiatrist.

10/2/10    AR 723-26    Plaintiff went to the Beloit Memorial Hospital, complaining of back pain.  She was given intervenous injections of Toradol and Diazepam and was discharged.  She was advised to take Diazepam and Percocet as previously ordered.

10/4/10    AR 727       Plaintiff returned to the Beloit Memorial Hospital, complaining of back pain.  She was given Solu-MEDrol [sic] and morphine

11

|          |          | intramuscularly and discharged. |
|----------|----------|---------------------------------|
| 10/28/10 | AR 895-96 | Plaintiff seen by Glenn Milos, D.O., in the emergency department of Mercy Hospital, complaining of a migraine headache and chronic lower back pain that had increased over the preceding four days.  She insisted on being hospitalized.  She had an MRI of her lumbar spine and was given morphine intervenously. |
| 10/28/10 | AR 891-92 | MRI of lumbar spine showed no evidence of herniated disc, some spinal stenosis at the L3-L4 and L-4-L5 levels with moderate narrowing of the spinal canal associated with moderate degenerative changes of the facet joint causing moderate narrowing of neural foramen bilaterally. |
| 10/29/10 | AR 639-40 | Plaintiff returned to Dr. Goetzen for followup of her seizure disorder, complaining of right shoulder pain that "was resolving after right shoulder surgery" and recent exacerbation of her chronic low back pain.  She told him that she had been helped by a shot of Toradol and that she had run out of Percocet prescribed by her primary physician.  Goetzen said he would give her a shot of Toradol and a new prescription for Percocet, limited to 100 tablets a month.  She was to come back in 7 days. |
| 11/2/10  | AR 641   | Plaintiff was reported to be attending physical therapy. |
| 11/2/10  | AR 703-04 | Plaintiff had a psychiatric visit with Galen Nelson, supervised by Jonas Lee, M.D.  She was described as frustrated and depressed, but alert and oriented to time, place and person. |
| 11/16/10 | AR 643   | Plaintiff seen by Dr. Matloob for post surgery review of her shoulder.  She complained of back pain radiating down her buttocks. Matloob prescribed Voltaren for a month and Flexeril muscle relaxant. |
| 11/19/10 | AR 732   | Plaintiff seen about 10:15 pm at the Beloit Memorial Hospital, |

12

after arriving in a wheelchair.  She was complaining of chronic back pain she said was related to degenerative joint disease.  She said she had not seen a physician recently and that Percocet was not giving her any pain relief.  She was given Dilaudid and Phenergan and discharged.

12/14/10   AR 801   Plaintiff seen by Matloob, who pronounced her shoulder as being totally asymptomatic, with full range of motion and no pain.

12/20/10   AR 809-12   Plaintiff seen by Mark Pease for psychiatric evaluation (on referral from Dr. Jonas Lee).  Pease found her alert and oriented, with a depressed and angry affect.  She had difficulty staying on topic and seemed "tangential with delusional content."  Her intelligence appeared average to below average and her insight and judgment were poor.  His diagnosis was major depression recurrent severe, intermittent explosive disorder and anxiety not otherwise specified.  He gave her a global assessment of functioning score of 50.  He recommended counseling and Citalopram for her depression.

1/17/11   AR 826-28   Plaintiff seen at emergency room at the Beloit Memorial Hospital at 2:42 pm, complaining of probable seizure and headache.  She said she had not seen a physician recently but was scheduled to see Dr. Goetzen in February.  She was given intramuscular injections of Phenergan and Toradol and discharged at 4:52 pm.

1/20/11   AR 799-800   Plaintiff seen by Dr. Goetzen for followup evaluation of chronic pain in lumber spine and right shoulder joint.  His plan was to get an EEG test and continue her seizure medicine and treatment for her chronic pain unchanged.

1/25/11   AR 830   Dr. Goetzen took an EEG recording of plaintiff as part of an evaluation of her seizures.

1/28/11   AR 797   Plaintiff seen by Dr. Goetzen for followup evaluation of her

13

|         |           | seizure disorder, complaining of chronic pain in her lumbar spine and right shoulder joint. |
|---------|-----------|--------------------|
| 2/9/11  | AR 795-96 | Plaintiff seen by Dr. Tecarro for followup of medical problems, complaining of chronic low back and neck pain.  Tecarro noted that Dr. Goetzen was continuing plaintiff on Percocet "and that seems to be holding her up." |
| 3/7/11  | AR 834-36 | Plaintiff seen at Beloit Memorial Hospital complaining of ankle and knee pain after a fall.  She reported that she had not recently seen a doctor.  She was given an air splint for her ankle and a wrap for her knee and discharged.  In addition, her right shoulder was reviewed.   No medications were administered and she was discharged. |
| 3/11/11 | AR 791    | Plaintiff seen by Dr. Goetzen for further evaluation of her seizure disorder.  He recommended that she have followup appointments with Dr. Maloob for her right shoulder pain.  He planned to increased plaintiff's dosage of Lamictal for her seizure disorder. |

## C. Treating Physicians

### 1. Dr. Monica Vohmann

In a Family and Medical Leave Request Health Care Provider Certification, AR 363-66, Dr. Vohmann, family medicine practitioner, reported that plaintiff had a health condition that would last indefinitely and require intermittent absences caused by neck and back pain secondary to cervical degenerative joint disease and migraines, as well as a history of seizures. AR 363.  She said that plaintiff could not sit or stand for any period of time or lift and carry 20 or more pounds, but could walk short distances, lift less than 20 pounds

14

infrequently and had limited movement in her arms.  AR 364.  She said that plaintiff would require intermittent leave for pain or headaches.  AR 365.

## 2. Dr. Krzysztof Goetzen

On November 17, 2010, Dr. Krzysztof Goetzen prepared a Seizures Residual Functional Capacity Questionnaire for plaintiff.  AR 780-84.  He reported having seen her initially on July 13, 2010 and again on July 27, August 17, September 9, September 23, and October 28, 2010.  His diagnosis was epilepsy, with plaintiff's first seizure occurring in October 8, 2008 and a grand mal seizure with loss of consciousness for which she was seen by Dr. Khabbaz and Dr. Kumar on July 13, 2010.  He estimated the frequency of her seizures as two to three times a month and said that her last three seizures had occurred in August, October and November of 2010, with the typical partial seizure lasting 5 to 15 minutes and the grand mal seizures lasting 15 minutes to a few hours.  AR 780.  He described the seizures as occurring without warning, at unpredictable times and causing plaintiff severe headaches, paranoia, exhaustion and urinary incontinence lasting several days.  AR 781.  He added that seizures caused plaintiff difficulty climbing stairs, inability to cook or drive and difficulty performing her tasks of daily living.  AR 782.  Plaintiff was compliant with taking her medication, but she suffered side effects: dizziness, double vision, lethargy, lack of alertness and coordination disturbance.  Id.

15

In Goetzen's opinion, plaintiff's seizures were likely to disrupt her co-workers, would require her to have more supervision at work than an unimpaired worker and prevent her from working at heights, working with power machines requiring an alert worker, driving a car and taking a bus by herself.  AR 783.  He also noted that plaintiff had depression, irritability, short attention span, memory problems, poor self esteem, social isolation and behavior extremes and he said she would sometimes need to take unscheduled breaks during an eight-hour working day, but would be unable to work at even a low stress job.  Id. Goetzen estimated that plaintiff would have to miss work more than three times a month and that she had other limitations: right shoulder pain and low back pain with difficulty walking.  AR 784.

In a Musculoskeletal Impairment Residual Functional Capacity Questionnaire, AR 786-89, Goetzen reported plaintiff's diagnoses as chronic low back pain, moderate lumbar spinal stenosis, chronic neck pain with disk protrusion and post-surgery shoulder pain that was resolving.  AR 786.  He characterized the pain as being of moderate intensity and daily. Id.  Plaintiff had a reduced range of motion in her right shoulder, impaired sleep, tenderness and an abnormal gait.  Id.  In Goetzen's opinion, plaintiff was not a malingerer, but she was depressed and anxious and had a personality disorder and psychological factors that affected her physical condition.  AR 787.  He described plaintiff as being extremely limited in her ability to deal with the normal stresses of competitive employment and he said her pain was

16

constantly of sufficient severity to interfere with her attention and concentration.  Id.  He thought she would be able to sit no more than 20 minutes at a time, id., and stand for no more than ten minutes, AR 788, and that she would be able to sit and stand less than two hours in an eight-hour workday.  Id.  He also found that she could not ever lift and carry as much as ten pounds in a competitive work situation, id., that she was limited in her ability to use her hands and fingers, AR 789, and that her musculoskeletal impairments would cause her to be absent from work more than twice a month.  Id.

## D. Consulting Physicians

1. Janis Byrd, M.D.

Dr. Byrd, an agency physician, completed a Physical Residual Functional Assessment of plaintiff on August 27, 2010.  She identified plaintiff's primary diagnosis as seizure disorder with a secondary diagnosis of chronic neck and back pain and other alleged impairments of asthma and migraine.  AR 670.  She found that plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk about six hours in an eight-hour day and sit for the same amount of time and push or pull with no limitation other than what she could lift and carry.  AR 671.  In addition, plaintiff could frequently climb ramp stairs, ladders, balance, stoop, kneel, crouch and crawl.  AR 673.  She had no manipulative, visual, communicative or environmental limitations.  AR 674-75.

17

Dr. Byrd took into consideration plaintiff's degenerative changes and pain in her back when she restricted her postural limitations to frequent. AR 676. She considered that plaintiff's seizures were generally controlled when plaintiff took her medication and did not drink alcohol and that her asthma did not require treatment beyond an inhaler. Id. She gave "marginal weight" to the work excuses written by Dr. Khabbaz and Dr. Vohmann because they were for short durations. Id.

2. Jack Spear, Ph.D.

Dr. Spear completed a Mental Residual Functional Assessment of plaintiff on August 30, 2010. He found that in all areas (understanding and memory, sustained concentration and persistence, social interaction and adaptation), plaintiff was either not significantly limited or moderately limited. AR 678-79. He found plaintiff's reports of her symptoms partially credible, noting that she had given inconsistent reports of why she was discharged from care after her destructive behavior and noncompliance with her pain clinic contract. AR 680.

In a psychiatric review technique, Spear based his medical disposition of plaintiff on the categories of affective disorders and personality disorders. AR 682. He noted that plaintiff had depressive disorder stemming from her pain and her fear of seizures, AR 685, and impulse control disorder, not otherwise specified. AT 686.

18

Spear found that plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace.  She had no episodes of decompensation, AR 692, and no evidence of "C" criteria.  (Under the Social Security regulations, "[t]he criteria in paragraphs B and C [of Pt. 4, Subpt. P, App.1] describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity" and "must be the result of the mental disorder described in [a] diagnostice description." § 12.00, Pt. 4, Subpt. P, App. 1.)

3. Pat Chan, M,D.

In a Physical Residual Functional Capacity Assessment dated January 6, 2011, Dr. Chan reached the same conclusions that Dr. Byrd had with respect to plaintiff's exertional limitations.  AR 749.  He found no postural, manipulative, visual, communicative or environmental limitations on plaintiff's ability to work.  AR 750-52.  He observed that plaintiff's seizures were under control, that she had had one serious seizure in June 2010 when she failed to take her medications and that her roommate's report that she had had seizures in June, July and August was only partially credible, although she did have one in September.  AR 752.  Chan found that this history of seizures did not warrant a restriction of exposure to hazards.  Id.

Chan noted the many complaints plaintiff had voiced to doctors, including seizures,

degenerative disc disease, migraines, neck and back problems and others.  AR 755.  He pointed out that throughout the time she was complaining of low back pain, she had a steady gait and normal-appearing extremities.  Id.  When she continued to have acute exacerbations of her back in October and November, she was given medications and sent home in stable condition.  Id.  On November 16, 2010, when she was at the emergency room, she was able to perform a straight leg raise of her left leg without pain and pain at 90 degrees when doing a straight leg raise of her right leg.  She did not have a foot drop and was able to stand on all toes and heels bilaterally.  On a November 25, 2010 visit to the emergency room, she had motor strength "5/5" and normal range of motion, but was complaining of being able to walk only half a block before taking a 15-20 minute break.  Id.

Chan found plaintiff's asthma under control and he noted that plaintiff was taking medication for her headaches and had had a negative MRI of her brain.  Id.  He concluded that the findings did not equal or meet a listing and that plaintiff was able to do light exertional work.  Id.

4. Dr. Eric Edelman, Ph.D.

Dr. Edelman prepared a Mental Residual Functional Capacity Assessment on January 7, 2011. As Dr. Spear had, Edelman found that plaintiff was either not significantly limited

20

or only moderately limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation.  AR 756-65.  Edelman found that her roommate's report that plaintiff was afraid of other people was only partially credible because plaintiff had said that she has help from her pastor and goes to church.  AR 758.  He concluded that she was capable of performing the basic mental demands of unskilled work.  Id.

In his psychiatric review technique form, Edelman agreed with Spear that a residual functional capacity assessment was necessary and he based his medical disposition on the categories of affective disorders and personality disorders.  AR 760.  He found that plaintiff had the medically determinable impairment of "Depressive Disorder due to pain and fear of seizure."  AR 763.  Deviating from Spear's assessment, he found that plaintiff had "[i]nflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress," namely "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior."  AR 767.

Edelman found that plaintiff had either mild or moderate restrictions of activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace.  AR 770.  He found no episodes of decompensation, id., and no evidence that the "C" criteria were present.  AR 771.

21

E. <u>Hearing Testimony</u>

1. <u>Plaintiff's testimony</u>

At the hearing before the administrative law judge that took place on May 25, 2011, plaintiff appeared with her counsel, Kerry Hellmuth.     Besides testifying to her past work history, her reason for leaving her most recent job at Meriter Hospital and her receipt of worker's compensation benefits, plaintiff testified that she had had trouble working at her last job because of pain in her back, neck and shoulder and because the medications she was taking made her groggy.  AR 49.  She admitted that she had held herself out as capable of working when she filled out the form for unemployment benefits.  <u>Id</u>.

Plaintiff testified that starting in 2008, she had had grand mal seizures about once every two to three months, with partial seizures occurring more frequently.  AR 52.  She said that her doctor had put restrictions on her driving but that no restrictions were listed on her driver's license.  AR 55.  She said that she had been free of grand mal seizures (but not partial seizures) for 90 days so her doctor was allowing her to drive within Beloit.  AR 56-57.

Plaintiff admitted having been involved in drugs for some time but said that she had been off drugs for the previous 15 years.  AR 58.  She said she had stopped drinking in June 2010 after her seizure at the hotel in Madison.  <u>Id</u>.  Before that, she had been drinking in moderation about twice a month from the time she left her job at Meriter Hospital.  AR 59.

22

Plaintiff said that a grand mal seizure may incapacitate her for up to two days.  AR 59-60.  Her body will be sore, she feels tired, she has a migraine and she lies around.  AR 60.  She said that she takes her medications consistently.  AR 61.  The seizures affect her attention span.  AR 62.

Plaintiff testified that she had a herniated disk in her neck and another one in her back, as well as arthritis and sciatica.  AR 63.  She said she had constant pain in her neck and back, sometimes so severe that it prevents her from walking.  Id.  She found it hard to stand or walk.  AR 64.  She said she typically takes Oxycodone three to four times a day, but the medicine is not always sufficient to relieve the pain.  AR 64.

Plaintiff said she had frequent migraines, often once or twice a week.  AR 67.  She takes Maxalt when she feels one coming on.  Id.  The headache usually lasts an hour but can go on for a month.  AR 67-68.  She has been seeing two therapists for her depression and has been taking Amitriptyline.  AR 68.

In response to questions from the administrative law judge, plaintiff said that she cleans her house, does laundry, gets her daughter to school and picks her up, goes shopping and does dishes.  AR 70.  She said that she had difficulty with her hands, that she could lift a full gallon of milk, that she can sit for about 20 minutes without having to get up and walk around, that when she walks she may have pain radiating downward from her neck to the back of the legs.  AR 72.

23

2. Testimony of medical expert

A licensed psychologist, James Armentrout, testified that he had heard plaintiff's testimony and reviewed the records in the case. AR 73. He found no basis for a diagnosis of major depressive disorder, AR 75, but thought that plaintiff had a "depressive disorder not otherwise specified." AR 76. He disagreed with the state agency physicians who had categorized her explosive disorder or impulse control disorder as a manifestation of a personality disorder. He found this finding not supportable, concluding that plaintiff's problem was better classified under organic mental disorders, emotional lability and impairment in impulse control. Id.

In Armentrout's opinion, plaintiff's mental and emotional limitations had only a mild affect on her daily activity. AR 77. She could drive, travel alone and independently, shop, manage money, do some cleaning, laundry and some meal preparation. AR 77-78. She would have moderate limitations in social functioning because of her impulsivity and anger. AR 78. She has had roommates, she talks on the telephone, socializes with her pastor and the church community and some neighbors. Id. He assessed as moderate the limitations on her ability to maintain concentration, persistence or pace. AR 78-79. Plaintiff had had no periods of decompensation. AR 79.

3. Testimony of vocational expert

24

Vocational expert Karl Botterbosch testified that he had heard plaintiff's testimony and had reviewed the records.  He concluded that plaintiff had no transferable skills from her prior work experience.  R 81.

The administrative law judge asked Botterbosch whether a hypothetical person could perform any of plaintiff's past relevant work if the person was plaintiff's age and had the education, work experience and evidence of record with a residual functional capacity of light exertion, with the ability to do frequent reaching, balancing, stooping, kneeling, crouching and crawling, the need to avoid hazardous heights or dangerous machines, the mental ability to simple, routine and repetitive work, understand, remember and carry out simple instructions, respond appropriately to supervisors, coworkers and the public and adjust to routine changes in the work setting. AR 81-83.  Botterbosch said the hypothetical individual could not. AR 83.  He added however that the person could perform some work that would fall within the hypothetical, such as work as a sales attendant, which is light work and unskilled.  Id. 1,973,000 of these jobs exist in the United States; 34,400 exist in Wisconsin.  Id.  He thought plaintiff could work as a cashier/checker, which is also light work.  3,400,000 of these jobs exist in the United States; 72,800 exist in Wisconsin.  Id.

The administrative law judge then asked Botterbosch to consider another hypothetical in which the individual can lift only three to four pounds, occasionally and frequently, can sit or stand for approximately 20-30 minutes but for only four to six hours

25

in an eight-hour day, she is able to handle only simple, routine and repetitive work and would miss two or more days of work each month because of psychological problems.  AR 83-84.  Botterbosch testified that there would no past relevant work for this individual or any work in the economy.  AR 84.  He added that having to miss two days a month of work would be the maximum allowable in an unskilled occupation.  Id.

### F.  Administrative Law Judge's Decision

In reaching his conclusion that plaintiff was not disabled, the administrative law judge performed the required five-step sequential analysis.  20 C.F.R. § 404.1520.  At step one, he found that plaintiff had not engaged in substantial gainful activity since January 29, 2010, the application date.  AR 11.  At step two, he found that plaintiff had severe impairments of disorder of the back and affective disorder that limited her ability to perform strenuous activities, interact with others and pay attention and concentrate.  Id. He found that although plaintiff had asthma, rotator cuff impairment, migraines and seizures, these medical problems did not constitute severe impairments.  In reaching this decision, he relied on the report from the state agency medical consultant, Pat Chan, who had found that plaintiff's asthma was controlled with medication; her rotator cuff was recovering from her September 2010 surgery; her migraines did not cause severe limitations and her seizures were under control as long as she took her medication.  AR 11.

26

At step three, the administrative law judge found that plaintiff's physical impairments did not meet or equal a listing in 20 C.F.R. § 404, Subpart P, Appendix 1, either singly or in combination.  Although he had found plaintiff's disorder of the back severe under the regulations, he found that it did not meet or equal any listed impairment because it did not have the requisite neurological deficits, such as motor loss, or the required functional limitation, such as the inability to ambulate effectively.  AR 12.  He reached a similar conclusion with respect to plaintiff's mental limitations: they did not equal a listed impairment because she did not have "marked" restriction in any of the relevant areas, with "marked" meaning more than moderate but less than extreme.  Id.

At step four, the administrative law judge found that plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except that she would be limited to no more than frequent climbing, balancing, stooping, kneeling, crouching and crawling and must avoid hazardous heights and exposure to dangerous machinery.  AR 14.  He limited plaintiff to simple, routine and repetitive work that required her to understand, remember and carry out simple instructions, respond appropriately to supervisors, coworkers and the public and adjust to routine changes in the work setting. Id.

In reaching this conclusion, the administrative law judge considered plaintiff's allegations that she suffered from migraines, seizures, chronic neck and back problems,

27

degenerative disc disease, mental problems, carpal tunnel syndrome and tendonitis.  Id.  He accepted as true her testimony that her seizures occur, that they cause her to be tired, confused and sore afterwards, that they keep her from getting her daughter to school in the morning and that they prevent her from driving and cause incontinence.  Id.  However, he did not credit her statements about the intensity, persistence and limiting effects of the symptoms to the extent they were inconsistent with the  residual functional capacity he had determined.  Id.

The administrative law judge discussed Dr. Goetzen's Seizures Residual Functional Capacity and Muscoskeletal Functional Capacity Questionnaires, explaining that he found Goetzen's opinions unpersuasive because they were not consistent with the other medical opinions in the record, particularly those that showed that plaintiff's seizures were well controlled by medication; they were contradicted by plaintiff's testimony at the hearing; they failed to take into consideration plaintiff's drug seeking behavior; and they ignored the inconsistencies among plaintiff's various statements.  AR 17.

Turning to plaintiff's mental impairments, the administrative law judge found that plaintiff was limited to simple, routine and repetitive work that required her to understand, remember and carry out simple instructions.  Id.  He found that she could respond appropriately to supervisors, coworkers and the public and adjust to routine changes in her work setting.  Id.  In reaching these conclusions, he relied on the opinions of the two state

28

psychologists who prepared the residual functional capacity assessments, saying that their opinions were consistent with the other evidence of record and that they were trained in the medical standards applicable under the Social Security Act.  He gave some weight to Dr. Green's opinion that plaintiff was not managing her symptoms well but little weight to Green's statement that plaintiff would have to learn to manage her pain before she could return to the workplace. AR 16.  In the administrative law judge's opinion, Dr. Green gave too much credibility to plaintiff's reports of her symptoms and ignored her drug seeking behavior, such as her actions at the Mercy Pain Management Clinic and at Dr. Farrag's office on December 23, 2009.  Id.

The administrative law judge noted plaintiff's visit to Dr. Hernandez on October 28, 2010, when she complained of severe back pain with urinary incontinence.  Id.  At that time, an MRI disclosed only moderate degenerative changes and no evidence of a herniated disk.  Id.  He noted that plaintiff's pain was well controlled by Dilaudid; she left the hospital against medical advice; and was able to ambulate without pain or any gait disturbance; and Dr. Hernandez found her urinary incontinence questionable.  Id.

The administrative law judge found that it was inconsistent for plaintiff to file for unemployment benefits at the same time as she claimed she was physically and emotionally unable to work.  AR 18.  He also noted the discrepancies in her reports of social interaction, saying at times that she is afraid of people and socializes only with her daughter, her

29

roommate and one neighbor and never goes to church, while saying at other times that she goes to church, socializes with her church community and her pastor.  Id.

The administrative law judge took into consideration plaintiff's drug seeking behavior, such as her failure to tell Dr. Keilhaier on December 23, 2008 that she had been at another clinic earlier that day to obtain pain medication and that she was on a pain clinic treatment contract, and her rage at the Beloit Clinic when she was denied narcotic pain medications.  Id.  He referred to Dr. Chan's observation that from June 2010 through the end of the year, plaintiff had developed a pattern of visiting hospital emergency rooms complaining of lower back pain and departing after receiving pain medication.  Id. (citing AR 755).

At step five, the administrative law judge found that plaintiff was unable to perform any past relevant work but that, given plaintiff's age, education, ability to communicate in English, work experience and residual functional capacity, she could work at jobs that exist in significant numbers in the national economy, specifically, sales attendant, unskilled, and cashier/checker, unskilled.  He concluded that plaintiff had not been under a disability, as defined in the Social Security Act, from January 29, 2010 through the date of his decision.


OPINION

A. Standard of Review

30

The standard by which a federal court reviews a final decision by the commissioner is well settled:  the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

B. Plaintiff's Disagreement with the Administrative Law Judge's Decision

Plaintiff objects to the administrative law judge's failure to give more weight to her seizures, to his giving less weight to her treating doctors than he did to the agency doctors who had not treated her and to his classifying her as a drug seeker.

1. Seizures

The administrative law judge gave good reasons for rejecting Dr. Goetzen's opinion that plaintiff's seizures prevented her from working regularly at even a low stress job:  the opinion was not consistent with other medical opinions that the seizures were well

31

controlled by medication; it was contradicted by plaintiff's hearing testimony; it did not take into account plaintiff's drug seeking behavior and it ignored the inconsistencies in plaintiff's various statements. This reasons are well supported by the record, which shows that Dr. Kumar had reported that plaintiff was able to keep her seizures controlled with a Keppra prescription. AR 371. Both Dr. Kumar and Dr. Goetzen are neurologists and both saw plaintiff a number of times, making them equally capable of assessing plaintiff's condition.

Goetzen relied on what he had been told by plaintiff about her seizures, how they came on, how long they lasted and the toll they took on plaintiff. In light of the many places in the record that cast doubt on the reliability of plaintiff's self-reports, as well as plaintiff's inconsistent testimony at her hearing about driving her car and her doctor's lifting of any restriction on her driving, it was not unreasonable for the administrative law judge to disregard Goetzen's opinion because of his reliance upon plaintiff's own reports of her condition. For example, Goetzen accepted plaintiff's report that she had urinary incontinence with her seizures, but the administrative law judge pointed out that plaintiff had told another doctor about having urinary incontinence in connection with back pain and that the doctor had found the report "questionable." AR 17.

Under Social Security Ruling 96-7p, an administrative law judge must follow a two-step process in evaluating an individual's own description of his or her impairments:

32

(1) determine whether an "underlying medically determinable physical or mental impairment" could reasonably be expected to produce the individual's pain or other symptoms; and (2) if such a determination is made, evaluate the "intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Social Security Ruling 96-7p, 1996 WL 374186, *1 (1996).  See also Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004).  When conducting this evaluation, the administrative law judge may not reject the claimant's statements regarding her symptoms on the sole ground that the statements are not substantiated by objective medical evidence.  Instead, the administrative  law judge must consider the entire case record to determine whether the individual's statements are credible.

In this case, the administrative law judge considered the entire record in determining that plaintiff's statements were not credible.  He discussed the medical findings, including the medications she was taking for her pain, depression, headaches and seizure disorder, her prior work record and the inconsistencies in her testimony.  SSR 96-7p; 20 C.F.R. §§ 404.1529(c), 416.929(c).  See also Scheck, 357 F.3d at 703; Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) (criticizing administrative law judge for not explaining "inconsistencies with the objective medical evidence, and inconsistencies with daily activities"). The administrative law judge discussed the varying reports that plaintiff had

33

made to the doctors and hospitals to which she had turned for medical care, her inconsistent testimony about her ability to drive despite her seizure disorder and her holding herself out as capable of working when she applied for and received unemployment benefits.  In addition, he explained the bases for his opinion that plaintiff's conduct was consistent with drug seeking behavior.

An administrative law judge's credibility determination is given special deference because that judge is in the best position to see and hear the witness and to determine credibility.  Shramek v. Apfel, 226 F.3d 809, 812 (7th Cir. 2000).  In general, an administrative law judge' s credibility determination will be upheld unless it is "patently wrong."  Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying.").  However, the administrative law judge still must build an accurate and logical bridge between the evidence and the result.  Shramek, 226 F.3d at 811. The court will affirm a credibility determination as long as the administrative law judge gives specific reasons that are supported by the record.  Skarbeck v. Barnhart, 390 F.3d 500, 505 (7th Cir. 2004).  In this instance, the administrative law judge gave specific reasons for his conclusion, and those reasons are supported by the record.

2. Weight given to treating doctor

34

Plaintiff's second objection is that the administrative law judge gave more weight to the opinions of the consulting physicians than he did to the opinions of her treating doctors.  20 C.F.R. § 416.927(c)(1) requires that, as a general rule, the commissioner give more weight to the opinions of treating physicians than to the opinions of doctors who do not have a chance to work with the patient over a period of time.  In fact, if the treating physician's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the agency is to give it controlling weight.  § 416.927(c)(2).

In deciding how much weight to give to a treating physician's opinion, the administrative law judge is to take into consideration "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion."  Id.  See also 20 C.F.R. §§ 404.1527(d)(2), 404.927(d)(2); Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010).

Although Dr. Goetzen found plaintiff incapable of working at even a low stress job when he filled out the musculoskeletal questionnaire, the administrative law judge found that his finding was not supported by the results of x-rays and MRIs taken of plaintiff, which generally showed only mild or moderate narrowing of plaintiff's spinal cord and

35

moderate degenerative changes of the facet joint.  Moreover, as the administrative law judge pointed out, it rested in large part on plaintiff's own complaints, which were inconsistent and not entirely credible.  In these circumstances, it was not error for the administrative law judge to give more weight to the opinions of the consulting agency doctors and to Dr. Hernandez, who saw plaintiff at Mercy Hospital on October 28, 2010, when she was complaining of severe back pain with urinary incontinence.

3. Drug seeking behavior

Plaintiff's last objection is that the administrative law judge erred in relying on her alleged drug seeking behavior, but this was a legitimate consideration in assessing the true severity of her back, neck and shoulder problems.  If her goal was to obtain prescription pain medication, she was more likely to overstate the pain she was actually experiencing. That this seemed to be the case is shown by the evidence cited by the administrative law judge, which showed that plaintiff was visiting hospital emergency rooms complaining of low back pain that was not entirely consistent with the objective medical findings and then departing after she had received pain medication.  In summary, I do not find any of plaintiff's objections well founded.

Finally, plaintiff argues that her receipt of unemployment compensation is proof that she has been trying to find a job but has been unsuccessful because of her limited education

36

and physical limitations, but this argument is unpersuasive. Plaintiff's receipt of unemployment compensation proves that she applied for it and was found eligible to receive it. It is not proof that she was denied work because of her physical limitations. She would not be receiving benefits unless she was holding herself out to the state of Wisconsin as being capable of working. It was reasonable for the administrative law judge to take her receipt of unemployment compensation into consideration in assessing her credibility.

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security, denying plaintiff Alisa Michele Morgan's application for disability insurance benefits is AFFIRMED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 30th day of April, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

37